UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DENISE DRUHOT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-2053 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| RELIANCE STANDARD LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This disability benefits case arises under the Employee Retirement Income Security Act

of 1974 ("ERISA"), 29 U.S.C § 1001 *et seq.* Plaintiff Denise Druhot seeks to recover benefits

under a group long-term disability ("LTD") insurance policy underwritten and administered by

Defendant Reliance Standard Life Insurance Co. ("Reliance Standard"). The parties have filed

cross motions asking the court to conduct a trial on the papers under Federal Rule of Civil

Procedure 52(a) and enter judgment. For the reasons explained below, the court enters judgment

for Druhot.

## I. STANDARD OF REVIEW

Sometimes called a bench trial, Rule 52 governs a proceeding in which the court,

rather than a jury, "find[s] the facts specially" and makes conclusions of law. Fed. R. Civ. P.

52(a)(1). A "trial on the papers" under Rule 52(a) "is well-suited to ERISA cases in which the

court reviews a closed record." *Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 885 (7th Cir.

2015) (citing *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001))

(ERISA benefits case); *see also Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991–

92 (N.D. Ill. 2003) (discussing advantages of using trials on the papers rather than summary

judgment in ERISA benefits cases). Courts routinely resolve ERISA benefits cases under

Rule 52. *E.g., Halley v. Aetna Life Ins. Co.*, 141 F. Supp. 3d 855, 858 (N.D. Ill. 2015)

(collecting exemplary cases). In these proceedings, a court can weigh the evidence and resolve

disputed factual issues based on the record properly before it. *See Crespo*, 294 F. Supp. 2d at

992.

Claims for benefits brought under ERISA § 502(a)(1)(B) are reviewed *de novo* unless

"the benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v.

Bruch*, 489 U.S. 101, 115 (1989).[1] This standard "requires the Court to review the case with a

fresh eye. In fact, the Court is not technically 'reviewing' any decision, but rather making its

own independent determination about the merits of the dispute and the employee's entitlement to

benefits." *Young v. Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850, 889 (N.D. Ill.

2009) (citing *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007)). In other

words, "the court can and must come to an independent decision on both the legal and factual

issues that form the basis of the claim. What happened before the Plan administrator or ERISA

fiduciary is irrelevant." *Diaz*, 499 F.3d at 643.

## II. FINDINGS OF FACT

The following facts are taken from the Administrative Record as well as the parties'

Statements of Fact.[2]

---

[1] The parties agree that the benefit plan does not include language giving the administrator or fiduciary discretionary authority.

[2] References to the Administrative Record will be cited by (AR__ ). References to the Plaintiff's Statement of Proposed Facts and Defendant's Statement of Proposed Facts will be cited as (PSF ¶ __ ) and (DSF ¶ __ ).

Druhot worked full time as an attorney at the law firm of Brown, Hay & Stephens LLP ("Brown Hay") in Springfield, Illinois from December 1, 1987, to January 2, 2015. (PSF ¶ 2.) Reliance Standard is an insurance company. (DSF ¶ 4.) Druhot received group long-term disability insurance coverage under a policy issued to Brown Hay by Reliance Standard. (PSF ¶ 3.) The policy provided for monthly disability payments so long as the participant met the definition of "Totally Disabled" or "Total Disability": "as a result of an Injury or Sickness, during the Elimination Period and thereafter an Insured cannot perform the material duties of his/her Regular Occupation." (AR 10.) "Regular Occupation" is defined by the plan as: "the occupation the Insured is routinely performing when Total Disability begins. The primary source we will use to determine the Insured's occupation is the Dictionary of Occupational Titles published by the Department of Labor, or its replacement(s)." (AR 9.) The schedule of benefits provided that payment at a rate of sixty percent of the insured's income would begin following ninety days of total disability and that benefits were payable so long as the claimant remained disabled until the claimant reached Social Security normal retirement age. (PSF ¶ 5.) Benefits are offset by "Other Income Benefits" such as Social Security disability insurance benefits. (PSF ¶ 6.)

Druhot left her regular occupation on or around January 2, 2015, with complaints of recurring viral and/or bacterial infections, sinus and ear problems, headaches, and fatigue. (DSF ¶ 13.) Brown Hay notified Reliance Standard of Druhot's claim for disability benefits on or about January 23, 2015. (*Id.*) Druhot submitted an application for benefits to Reliance Standard on February 6, 2015. (PSF ¶ 8.) The application stated that Druhot's first symptoms were "recurring infections, sinus + ear + headaches, extreme fatigue." (AR 181.) The application also

stated that Druhot was unable to work due to "immune deficiency per Dr. Siri, recurring viral +/or bacterial infections etc." (*Id.*)

Druhot reported that she was treated for her illness by Dr. Dareen D. Siri, an immunologist. (AR 182.) Druhot submitted an attending physician statement from Siri which listed the primary diagnosis ICD9 code as 279.06, which corresponds to "common variable immunodeficiency." [3] (AR 190.) The statement listed symptoms as "recurrent infections" and treatment with "gamma globulin infusions." (*Id.*) Dr. Siri checked boxes signifying that Druhot had not achieved maximum medical improvement and that her condition led to certain restrictions and limitations. (AR 190–01.) Siri limited Druhot to sedentary work and occasional light work. (*Id.*) Siri also noted that Druhot was experiencing severe headaches. (*Id.*) A statement from Siri dated January 2, 2015, asserts: "Denise is placed on medical leave for six weeks from today's date. She may not return to work until medically cleared." (PSF ¶ 10.) Another, from February 5, 2015, states: "Denise Druhot is placed on medical leave for four months from today's date. She may not perform any work and must be medically cleared before returning to work. She has a serious immune deficiency disorder for which she is beginning treatment." (*Id.* ¶ 11.)

Druhot also submitted Dr. Siri's office records for November 2014 to February 2015. (AR 321–45.) The records indicate that Druhot was experiencing fatigue, ear and sinus issues, joint pain, acute sinusitis, gastritis, and cervicalgia. (PSF ¶12.) Dr. Siri began infusing Druhot with HyQvia, an immune globulin infusion, in February 2015. (*Id.*) Dr. Siri also noted the

---

[3] ICD9 is "The International Classification of Diseases, 9th Revision." The Court may take judicial notice that the 279.06 ICD9 code stands for "common variable immunodeficiency" as the fact is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

presence of migraine and sinus headaches at that time.  (*Id.*)  Dr. Siri's March 25, 2015, note

indicated that Druhot was experiencing ear, nose, throat, and eye issues.  (AR 491.)  The note

states that Druhot had a 99.0 temperature on March 14, 2015.  (*Id.*)  The note also indicates

Druhot underwent an endoscopy and a colonoscopy which showed a hiatal hernia, diverticulitis,

and GERD.  (*Id.*)

Reliance Standard interviewed Druhot by telephone on March 3 and 26, 2015.  (DSF ¶

20.)  Druhot told Reliance Standard that she was planning to travel to visit her father from

March 27–April 4, 2015.  (*Id.*)  Additionally, as part of the review of her claim, Reliance

Standard had an investigator perform surveillance on Druhot in April 2015.  (PSF ¶ 16.)   The

investigator reported that Druhot walked her small dog around the block.  (*Id.*)  In a declaration

submitted in this case, Druhot denies that she was the one walking the dog. [4]  (*Id.*)

---

[4] Defendant objects to any reference to Druhot and her husband's declarations, arguing that they were "outside of the documents agreed upon to form the basis for the parties' motions for judgment."  Under *de novo* review, district courts have "discretion to 'limit the evidence to the record before the plan administrator, or . . . [to] permit the introduction of additional evidence necessary to enable it to make an informed and independent judgment."  *Estate of Blanco v. Prudential Ins. Co. of Am.*, 606 F.3d 399, 401 (7th Cir. 2010) (quoting *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 490–91 (7th Cir. 2007) (alterations in original)).  A court must consider four factors in determining whether extra-record discovery should be allowed: "(1) whether the new evidence is necessary to make an informed and independent judgment; (2) whether the parties had an opportunity to present evidence at the administrative level; (3) whether the extra-record discovery relates to the plan terms or historical facts concerning the claimant; (4) whether the administrator faces a conflict of interest."  *Novak v. Life Ins. Co. of N. Am.*, 956 F. Supp. 2d 900, 911 (N.D. Ill. 2013) (quoting *Blanco*, 606 F.3d at 402; *Patton*, 480 F.3d at 491) (internal quotations omitted).  "The most important factor . . . is whether the new evidence is necessary to make an informed and independent judgment." *Blanco*, 606 F.3d at 402.  Plaintiff argues that portions of the declarations, at least, go toward undercutting medical opinions based on the surveillance that Defendant performed, which bears on the first factor.  The second factor is unclear as Plaintiff argues that some of the facts in the affidavit were presented during her appeal, but some could not have been presented during the administrative proceedings because she did not realize that certain medical opinions were based on the surveillance and because one examination took place after she filed her appeal.  The third factor cuts against the inclusion of the declarations as they go towards historical facts concerning the Plaintiff and not to plan terms.  *See Blanco*, 606 F.3d at 402 ("Evidence is more appropriately admitted if it concerns important plan terms rather than historical facts about the claimant.").  As to the fourth factor, Plaintiff does not claim the administrator had a conflict of interest.  To the extent that the declarations contain facts that would undercut the persuasiveness of a medical opinion, they will be considered.  Nevertheless, the court would reach the same conclusion without the declarations.

Reliance Standard referred Druhot's file to an immunologist, Dr. Anita Shvarts, who prepared a ten-page report and a three-page addendum report. (PSF ¶ 17.) Dr. Shvarts concluded that Druhot's symptoms and laboratory results were consistent with common variable immunodeficiency. (AR 508–09.) Dr. Shvarts also reported a secondary diagnosis of sinusitis. (AR 508.) The report also stated that the medical record demonstrated that Druhot experienced worsened fatigue from January 7, 2015, to February 4, 2015. (AR 509.) Dr. Shvarts concluded that Druhot could work on a consistent full-time basis and that "[t]here is no documentation that [Druhot] cannot ambulate, sit, walk, shower, drive or communicate clearly." (AR 510.) The report recognized that Druhot would need to be on IgG replacement therapy for the rest of her life, but stated that Druhot's prognosis was good. (AR 511–12.) On May 4, 2015, Dr. Shvarts completed an addendum to her report after additional records were received. (AR 515–17.) Dr. Shvarts held to her previous findings and conclusions after reviewing the new information. (AR 517.) She explained that while sinus and ear infections continued to occur, no fatigue was mentioned and "there is no mention of difficulty ambulating or difficulty doing daily activities of life." (AR 516.)

On May 7, 2015, Reliance Standard denied Druhot's claim for benefits and sent a letter explaining its decision. (AR 133–38.) The letter stated that "a staff Vocational Specialist reviewed the pertinent information in your file and determined your Regular Occupation to be that of an Attorney, which is considered a sedentary-exertion level occupation." (AR 134.) In order to qualify for benefits under the policy, the letter continued, "[Druhot] must have been *continuously* unable to perform the material duties of an Attorney, a sedentary occupation, at or around January 2, 2015 and beyond April 2, 2015." (AR 136 (emphasis in original).) The letter

told Druhot that she did not satisfy the Policy's definition of Total Disability, that she was not eligible for long-term disability benefits, and that her claim was denied. (AR 137.)

Druhot appealed the denial of her benefits on July 27, 2015. (AR 521–66.) In her appeal letter, Druhot stated that she was falling asleep at her desk and had difficulty staying awake when driving to and from hearings in the last few months of 2014. (AR 522.) She described her treatment and the side effects of that treatment, which included suddenly bursting into tears, moodiness in the form of increased irritability, increased fatigue, sporadic headache, flu-like symptoms, and itchy, red, and burning skin around the infusion site. (*Id.*) Druhot also stated that she has been in constant physical pain and fatigue due to difficulty sleeping because of the pain. (*Id.*) She added that her poor gastrointestinal health impaired her ability to practice law due to unscheduled visits to the bathroom. (AR 523.) She asserted that her symptoms "impair my ability to focus, critically think, remember, advocate, analyze, counsel, produce and interact effectively and/or positively with clients, courts, hearing officers, opposing attorneys, staff and colleagues, all of which are cornerstones of legal practice." (PSF ¶ 26.)

The appeal was supplemented by a report and letter from Dr. Siri. (PSF ¶¶ 27–29.) Dr. Siri opined that Druhot met the applicable policy definition of total disability due to illness. (AR 524.) According to Siri, Druhot could not perform the functions of her job as an attorney. (AR 525.) Dr. Siri stated that Druhot had the following diagnoses: common variable immunodeficiency, osteoarthritis, possible rheumatoid arthritis, severe fibromyalgia, severe diverticulosis, irritable bowel syndrome, chronic headaches, dysphagia, recurring middle ear infections, recurring fever, vitamin deficiency/malabsorption, hiatal hernia, bladder infections, and chronic fatigue. (AR 526.) Druhot also provided records of her treatment at the Mayo

Clinic on June 23 and 25 2015. (AR 572–83.) Druhot was seen and evaluated for common variable immunodeficiency, joint and muscle pain associated with fibromyalgia, and foot pain. (AR 580.) She was diagnosed with symptoms of early generalized osteoarthritis. (AR 583.)

Reliance Standard asked Druhot to see Dr. Richard Katz, a physiatrist, who examined her on September 16, 2015. (PSF ¶ 31.) Dr. Katz diagnosed Druhot with a somatization disorder, which he defined as "a syndrome of physical symptoms that are distressing and my not be fully explained by a known medical condition after appropriate investigation." (AR 599.) He also stated that the diagnosis of fibromyalgia was "misguided" and doubted Druhot's common variable immunodeficiency diagnosis. (AR 600–01.) He opined that Druhot could work full time without restriction. (AR 602.) Dr. Katz also determined that Druhot could perform any activity continuously during the work day and could work at the "very heavy lift" exertional level. (AR 603-04.) After receiving the Mayo Clinic records, Dr. Katz wrote a supplementary report that stated that his opinion was unchanged and that "[a]pparently somatization disorders are not on the map for these physicians." (AR 627–28.)

On October 23, 2015, Reliance Standard sent Druhot's medical files to Dr. Matthew Wilson, who works in pediatrics and allergy and immunology. (AR 635–640.) Dr. Wilson did not examine Druhot in person but did review her medical records. (PSF ¶ 37.) Dr. Wilson stated that the lab data did not support a diagnosis of common variable immunodeficiency but did support a diagnosis of hypogammaglobulinemia. (AR 636.) He also referenced the surveillance and noted that Druhot appeared to be able to walk and perform other activities associated with walking a dog without any difficulty. (AR 637.) According to Wilson, Druhot "has no limitations of activities of daily living." (*Id.*) Wilson also opined that there were no medical

data or examination findings to substantiate her complaints. (AR 637–38.) He concluded that Druhot could return to work immediately without any physical restrictions. (AR 639–40.) In a supplementary report dated December 10, 2015, Wilson stated that additional documentation did not change his analysis. (AR 744–48.)

On October 26, 2015, Druhot requested a copy of the Independent Medical Examination report. (AR 641–42.) After receiving the report, Druhot submitted additional documentation including: a CT scan of both sinuses dated February 23, 2015, showing sphenoid sinusitis; records from Dr. Siri dated November 20, 2015, reflecting chronic sinusitis and a Eustachian tube disorder; an MRI of Druhot's lumbar spine dated October 1, 2015, showing degenerative disc disease and arthritis in the lower lumbar spine; a physical therapy initial intake evaluation dated November 16, 2015, stating that Druhot has difficulty with bending forward, with lifting and carrying, with standing or walking for a prolonged time, and with performing activities of daily living; a note from Dr. Edward Trudeau, a physiatrist, dated June 9, 2015, opining that Druhot should go to the Mayo Clinic for autoimmune disorder and arthritis testing; x-rays of the cervical spine taken April 27, 2015, showing degenerative changes and osteophytes in the cervical spine; a record of a follow-up visit with Sriya Ranatunga dated September 14, 2015, with an assessment of fibromyalgia; summary/progress notes from Dr. Siri dated July 1, 2015, September 22, 2015, October 7, 2015, October 30, 2015, and November 20, 2015; and a list of prescribed medications from January 1, 2014, to November 24, 2015. (PSF ¶ 36.) Reliance Standard upheld the denial of benefits on January 7, 2015. (PSF ¶ 39.)

On February 20, 2015, Reliance Standard suggested that it may be in Druhot's interests to apply for Social Security Disability benefits. (AR 119.) Druhot was approved for Social

Security Disability Benefits.  (PSF ¶ 41.)[5]  On September 4, 2015, the Social Security

Administration ("SSA") issued a "Disability Determination Explanation" and a "Disability

Determination and Transmittal."  (PSF ¶ 43.)  The SSA determined that Druhot's primary

impairment was fibromyalgia with a secondary impairment of a spinal disorder.  (*Id.*)  The SSA

also decided that Druhot could not return to her former occupation as an Attorney/Partner

because "the individual is incapable of sustaining a 40-hour workweek."  (SSR 266.)[6]  The SSA

also stated that Druhot did not have the residual functional capacity to perform past relevant

work.  (*Id.*)  The SSA performed a quality review and issued a second Disability Determination

Explanation on October 28, 2015, wherein the reviewing doctor found Druhot's statements "fully

credible." (SSR 283–93.)  But the SSA determined that further development was required to

properly adjudicate the claim.  (SSR 294–95.)  The SSA issued a new Disability Determination

Explanation and Disability Determination and Transmittal on November 24, 2015.  (PSF ¶ 46.)

The new determination reached the same conclusions as the previous determination, finding that

Druhot had been disabled since January 2, 2015, and that medical improvement was not likely.

(*Id.*)

Druhot then sent Reliance Standard the administrative record relating to the Social

Security Claim.  (PSF ¶ 41.)  On February 2, 2016, Reliance Standard responded that its internal

guidelines only allowed for one appeal, which had already been provided.  (AR 161.)

---

[5] Defendant objects to the declaration of Plaintiff's attorney and the Social Security claim administrative record as "outside of the administrative record and not agreed upon by the parties as among the evidence the parties' motions were to be based on."  Neither party has submitted an agreement limiting the evidence considered, nor is it clear than any such agreement would limit the court.  As discussed above, *supra* 5 n.4, under *de novo* review, district courts have discretion to limit the evidence to the administrative record or permit the introduction of additional evidence. *Blanco*, 606 F.3d at 401.  Here, consideration of the Social Security record is helpful in making an informed and independent judgment and the parties did not have the opportunity to present the evidence at the administrative level.  The Social Security record will be considered.
[6] The administrative record of the Social Security Agency will be cited as (SSR __ ).

# III. CONCLUSIONS OF LAW

Druhot bears the burden to show by a preponderance of the evidence that she is entitled to benefits under the Policy. *See Halley*, 141 F. Supp. 3d at 865–66 (citing *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005)); *Curtis v. Hartford Life & Accident Ins. Co.*, 64 F. Supp. 3d 1198, 1212 (N.D. Ill. 2014); *see also Diaz*, 499 F.3d at 643 ("[A]t trial the plaintiffs would bear the burden of proving [the ERISA beneficiary's] entitlement to the benefits of the insurance coverage, and the defendant [insurer] would bear the burden of establishing [the beneficiary]'s lack of entitlement . . . ." (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (alterations except the first in original)). To determine what Druhot must prove, the court looks to the plan's language. *See, e.g.*, *Frye v. Thompson Steel Co.*, 657 F.3d 488, 493 (7th Cir. 2011).

## A. "Total Disability" Under the Plan Includes "Partial Disability"

The plan provides that the insurer "will pay a Monthly Benefit if an Insured . . . (1) Is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) Is under the regular care of a Physician; . . . [and] (4) submits satisfactory proof of Total Disability . . . ." (DSF ¶ 9; AR 17.) The plan includes following definitions:

> "'Regular Occupation' means the occupation the Insured is routinely performing when Total Disability begins. The primary source we will use to determine the Insured's occupation is the Dictionary of Occupational Titles published by the Department of Labor, or its replacement(s)."
>
> . . . .
>
> "Sickness" means illness or disease causing Total Disability which begins while insurance coverage is in effect for the Insured. Sickness includes pregnancy, childbirth, miscarriage or abortion, or any complications therefrom.

11

"Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness. during the Elimination Period and thereafter an Insured cannot perform the material duties of his/her Regular Occupation;

(1)     "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her Regular Occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and

(2)     "Residual Disability" means being Partially Disabled during the Elimination Period.   Residual Disability will be considered Total Disability.

(AR 9–10.)

Courts applying these definitions have agreed that "Partial Disability is equivalent to Total Disability." *Marcin v. Reliance Standard Life Ins. Co.*, 861 F.3d 254, 256 (D.C. Cir. 2017); *see also McKeldin v. Reliance Standard Life Ins. Co.*, 254 F. App'x 964, 968 (4th Cir. 2007) (per curiam, unpublished) (reading pertinent language defining "total disability" and "partial disability" together to mean that "partial disability is sufficient to establish eligibility for receipt of total disability benefits" but reaching different outcome based on additional language not present in the instant plan); *Karvelis v. Reliance Standard Life Ins. Co.*, No. Civ.A. H-03-3848, 2005 WL 1801943, at *17 (S.D. Tex. July 28, 2005) (same reading after elimination period).   Under these definitions, Druhot must prove by a preponderance of the evidence either that she cannot perform one or more of the material duties of her regular occupation on a full-time basis or that she cannot perform any of the material duties of her full-time occupation on a part-time basis.   (*See* AR 9.)

1. The "Material Duties" Of Druhot's "Regular Occupation" as an Attorney

Reliance Standard and its doctors focus mainly on whether Druhot can perform the relatively low physical demands of being an attorney. Like the doctors it hired to review Druhot's file and examine her, Reliance Standard argues before this court that Druhot's regular occupation was sedentary and that there is no evidence showing Druhot is incapable of performing a sedentary-level occupation. This focuses more narrowly than the plan requires. As just explained, the court must determine what the "material duties" of Druhot's "regular occupation" are.

Druhot began working at her law firm in 1987; she worked her way up to partner. (*See* AR 184–85 (listing work history).) Reliance Standard determined that the Dictionary of Occupational Titles code for Druhot was 110.107-010, "Attorney," which the Department of Labor describes as a "sedentary level position." (DSF ¶ 19; *see also* AR 9 (definition of "regular occupation" listing manual as primary authority).) The occupational requirements list the necessary strength as "Sedentary. Lifting, Carrying, Pushing, Pulling 10 [lbs.] occasionally. Mostly sitting, may involve standing or walking for brief periods of time." (AR 217.) But the occupational data lists such tasks as:

> 1. Gathers evidence in divorce, civil, criminal, and other cases to formulate defense or to initiate legal action.
> 2. Conducts research, interviews clients and witnesses, and handles other details in preparation for trial.
> 3. Prepares legal briefs, develops strategy, arguments, and testimony in preparation for presentation of case.
> 4. Files brief with court clerk.
> 5. Represents client in court and before quasi-judicial or administrative agencies of government.
> 6. Interprets laws, rulings, and regulations for individuals and businesses.

(AR 216.)

Reliance Standard accuses Druhot of trying improperly to expand this list of material job functions. Druhot cites a pair of ERISA benefits cases recognizing an attorney's job demands long hours and intensive research that is qualitatively different from the sort anyone might conduct at home when trying to understand a problem like her own medical condition. *See Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 347 (5th Cir. 2002) (holding plan administrator relied on answer to question that "unfairly equate[d] amateur research conducted by a severely ill individual trying to find answers about her painful and incurable sickness with the kind of daily performance required of an attorney specializing in major sophisticated real estate and financial transactions. Equating these disparate activities reflects plain lack of objectivity . . . ."); *Rosenthal v. Long-Term Disability of Stein, Becker & Green, P.C.*, No. CV-98-4246 GAF MANX, 1999 WL 1567863, at *8 (C.D. Cal. Dec. 21, 1999) (stating, based on record evidence relevant to beneficiary, that "[a] trial attorney, especially an associate in a litigation firm, must be available to work for as long as necessary to meet the demands of a trial – or perhaps some other urgent matter such as a TRO or preliminary injunction hearing. One in Rosenthal's situation simply cannot walk out of her office or the court when her 8 hour day ends."). While the court does not focus exclusively on whether Druhot worked as a trial lawyer, it also recognizes that the practice of law encompasses a wide variety of practice areas and settings; many vary in the skills demanded and the hours an attorney must work. *See generally* Nat'l Assn' of Law Placement, *Official Guide to Legal Specialties* (1st ed. 1999).

In this case, Reliance Standard had more specific information about the duties Druhot performed. Her employer listed her "major tasks" as "court appearances, client meetings, general document preparation and research." (AR 167.) Boxes checked on a form submitted by

Druhot's employer showed that she had to continuously make independent judgements, relate to others, and communicate verbally and in writing. (AR 167.) Druhot's job called upon her to employ reasoning, math, and language. (*Id*.) Druhot's employer also checked boxes signifying that her job required occasional standing, stooping, and walking as well as continuous sitting. (*Id*. (stating that 75% or more of Druhot's time was spent at a computer).)

Druhot described her duties as follows in the claim form she submitted to the plan: "practice law for public and private entities and individuals; including public court appearances, meetings at public schools, hearings and conferences at public agencies (county and state), nursing homes, K-12 public schools, numerous county courthouses; advocate for clients in all venues." (AR 184 (some punctuation altered and added).) As Reliance Standard cites nothing contradicting any of this evidence, the only question left is whether Druhot has proven that it is more likely than not that her ability to do one of more these things has been impaired.

2. Druhot is Unable to Perform Material Duties of Her Primary Occupation Due to Sickness

Records show that Druhot experienced a rash of symptoms from 2014–15, including fatigue, ear and sinus problems, joint pain, acute sinusitis, gastritis, and cervicalgia. (*See* AR 321–45.) Druhot reported migraines and sinus headaches in February 2015, and Dr. Siri began infusions of an immune globulin. (AR 340.) Despite the infusions, Druhot experienced ongoing symptoms and a low-grade fever. (*See* AR 491–501.) Testing also revealed a hiatal hernia (AR 498) and severe diverticulosis (AR 501–02).

Dr. Siri put Druhot on medical leave beginning on January 2, 2015 (AR 193) for what she described the next month as a "serious immune deficiency disorder" (Common Variable Immunodeficiency ("CVID")) (AR 194.) Dr. Siri put Druhot on medical leave after she made

increasing complaints of "severe fatigue" and "inability to concentrate at work" due to increasingly frequent sinus infections that did not respond to antibiotics. (AR 505; *see also* AR 509–10 (discussing history of reports of fatigue and excessive sleeping to Dr. Siri).) The doctor who conducted Reliance Standard's initial file review, Dr. Shvarts, confirmed Dr. Siri's diagnoses of CVID and chronic sinusitis. (AR 503–08 (agreeing that symptoms were "consistent with CVID").

Druhot visited the Mayo Clinic on June 23 and 25, 2015, where she received a fibromyalgia diagnosis. (AR 574–80.) "There used to be considerable skepticism that fibromyalgia was a real disease. No more." *Kennedy v. Lilly Extended Disability Plan*, 856 F.3d 1136, 1137 (7th Cir. 2017) (Posner, J.) (collecting and discussing authority); *see also Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003); *Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir. 1996). The disease affects about five million Americans over the age of 18. *Kennedy*, 856 F.3d at 1137 (citing National Institute of Arthritis and Musculoskeletal and Skin Diseases, "Questions and Answers about Fibromyalgia," July 2014, www.niams.nih.gov/Health_Info/Fibromyalgia/default.asp (visited May 16, 2017)). It is "a common and chronic disorder characterized by widespread pain, diffuse tenderness, and a number of other symptoms . . . . [F]ibromyalgia can cause significant pain and fatigue, and it can interfere with a person's ability to carry on daily activities." *Id*. at 937 (quoting same source) (second alteration in original). The severity of fibromyalgia varies; not every case leaves a person completely unable to work. *Hawkins*, 326 F.3d at 918. The question, then, is how Druhot's fibromyalgia and her other conditions affect her ability to perform the material duties of her job. *See id*.

16

Adding to the clear implication of putting Druhot on medical leave, Dr. Siri addressed that question directly in her letter in support of Druhot's appeal. Dr. Siri opined that Druhot met the plan's definition of total disability to a reasonable degree of medical certainty. (AR 524.) The letter noted that Dr. Siri recommended that Druhot stop working in 2014, but Druhot wanted to satisfy her obligations to her partners. (AR 524–25.) Dr. Siri's July 28, 2015, letter also explained how Druhot's conditions prevented her from "interviewing clients, preparing case reports, attending court hearings, [and] review[ing] technical legal documents." (AR 525.)

Druhot also wrote a letter in support of her appeal. Consistent with Dr. Siri's letter, Druhot concluded her letter with a succinct summary of the effect her conditions have on her ability to work as an attorney:

> In sum, fatigue, infections, CVID, and infusion therapy, gastrointestinal issues, and constant physical pain impair my energy, mental clarity, reliability and availability. Fatigue, infections, CVID and infusion therapy, gastrointestinal issues, and constant physical pain impair my ability to focus, critically think, remember, advocate, analyze, counsel, produce and interact effectively and/or positively with clients, courts, hearing officers, opposing attorneys, staff and colleagues, all of which are cornerstones of legal practice.

(AR 523.) Consistent with her summary, notes from Dr. Katz and Dr. Wilson confirm that Druhot described her gastrointestinal problems, due to severe diverticulosis as diagnosed by Dr. Butnariu (AR 558), which left her unable to eat solid food for days, and included sudden bouts of diarrhea that forced her to run to the bathroom unexpectedly. (*See* AR 591–92, AR 636–37.) She recounted incidents in which she was falling asleep at her desk and others in which she found staying awake difficult when travelling to out-of-town hearings. (AR 522.) She stated that in November 2014, her fatigue forced her to leave a hearing, and she also stated that she

"lost her train of thought in the middle of addressing courts and questioning witnesses on more than one occasion during the last few months of 2014." (AR 522.)

In his examination report, Dr. Katz noted Druhot's reports that her pain caused her to get fewer than two hours of sleep each night and that she could not sit for more than ten minutes. (AR 587.) She also reported "a great deal of difficulty concentrating." (AR 587.)

The Seventh Circuit has made clear that "although a plan may not deny benefits solely on the basis that the symptoms of the claimed disability are subjective, a plan may deny benefits because a claimant has failed properly to document pain-induced functional limitations." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 485 (7th Cir. 2009) (citations omitted). Together, Druhot's letter, Dr. Siri's analysis, the Mayo Clinic's diagnosis, Dr. Katz's notes (especially about getting fewer than two hours of sleep per night), and the supporting medical records demonstrate functional limitations: Druhot's conditions make her unable effectively to meet with clients, conduct research, and draft legal documents in any reasonable practice setting. (*See* AR 216 (tasks 2, 3, and 5).) This court finds the evidence that Reliance Standard marshals to disprove impairment unpersuasive, largely because it does not engage with the "material duties" of Druhot's job. (AR 10.)

The surveillance report suffers from this defect as well. (*See* AR 468, 485-86.) As the Seventh Circuit observed in a similar case about a psychological impairment, "That [Druhot] can clean her home and care for her pets . . . does not support a conclusion that she is capable of employment unless the Plan believes she is qualified to care for animals as a living." *Tate v. Long Term Disability Plan for Salaried Emps. of Champion Int'l.*, 545 F.3d 555, 561 (7th Cir. 2008), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242

(2010).  At the risk of belaboring the point, nowhere on the list of job tasks which Reliance

Standard prefers (AR 216) does dog walking appear.  So lawyers, at least for plan purposes, are

not dog walkers, and analyses of Druhot's conditions' effect on her ability to walk a dog and get

the mail miss the mark.  Druhot has never denied that she could not walk short distances, and

that is not the basis of her disability claim.[7]

    Dr. Shvarts's reports similarly conflate basic life activities with an attorney's material

duties.  After reviewing Druhot's file, Dr. Shvarts opined that Druhot had a good prognosis

because there was no documentation showing that she "cannot ambulate, sit, walk, shower, drive,

or communicate clearly."  (AR 509 (noting also that Druhot has not been hospitalized); *see also*

AR 516 (reaching same conclusion after reviewing additional records, adding "difficulty doing

daily activities of life").)  Again, the "material duties" of an attorney demand more than

walking, sitting, showering, and communicating clearly.  (*See* AR 216.)  Also, Dr. Shvarts did

not have the benefit of the Mayo Clinic's fibromyalgia diagnosis, Dr. Siri's subsequent letter, and

Druhot's further elaboration on the effects of her conditions in her letters and to Dr. Katz.

    Dr. Katz's report shows that he knew that Druhot worked as an attorney in general civil

practice.  (AR 590.)  Rather than engaging with these functional limitations, Dr. Katz examined

Druhot and diagnosed her with "somatization disorder," i.e., "a syndrome of physical symptoms

that are distressing but may not be fully explained by a known medical condition after

appropriate investigation."  (AR 599.)  He added that somatization is frequently accompanied by

depression and anxiety.  (*Id*.)  He rejected the notion that Druhot's symptoms could be explained

---

[7] Nor does the record the court can consider give any reason to think that this was not an isolated incident.  That it did not happen on each of the three days the investigator observed Druhot's home suggests that it may have been. (*See* PSF ¶ 16.)

as a reaction to the medication she was taking. (AR 600.) Lastly, Dr. Katz stated that he

believed the fibromyalgia diagnosis was "misguided," but he did not elaborate on his reasoning.

(*Id.*) Dr. Katz later reviewed the records of Druhot's visit to the Mayo Clinic. In a single

sentence of analysis, he stated that his opinion had not changed: "Apparently, somatization

disorders are not on the map for these physicians." (AR 628.) The Mayo Clinic's records tend to

contradict Dr. Katz's glib speculation. They show that the bulk of the time spent with Druhot

was devoted to discussing fibromyalgia, its acceptance in the medical world, and possible

treatment. (*See* AR 574; *see also* AR 580.)

Dr. Katz's report sets up a false choice. He leaps without real explanation from the

diagnosis of a somatic disorder to the assertion that Druhot can work. (*See* AR 601–02.) His

report implies a false equivalency between somatic disorders and malingering. (*See* AR 601.)

The Seventh Circuit reversed an administrative law judge making a Social Security disability

determination for making just such a mistake:

> Pain is always subjective in the sense of being experienced in the
> brain. The question whether the experience is more acute because
> of a psychiatric condition is different from the question whether
> the applicant is pretending to experience pain, or more pain than
> she actually feels. The pain is genuine in the first, the psychiatric
> case, though fabricated in the second. The cases involving
> somatization recognize this distinction.

*Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (collecting cases). Even taking Dr.

Katz's somatization diagnosis at face value, he disagrees about whether the pain Druhot is

experiencing has a psychological or physical origin, not whether it is "genuine," *id.*, and he

offers no objective analysis of her limitations. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317,

322 (7th Cir. 2007) (discussing difference between an individual's "entirely subjective"

experience of the "amount of fatigue or pain . . . experience[d] and "how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured"). Indeed, his report includes a chart showing that Druhot subjectively reported pain on much of her body (AR 588), but Dr. Katz proffers nothing in the way of a functional analysis; he just makes a different diagnosis (AR 601–02); *cf. Hughes v. CUNA Mut. Long Term Disability Ins.,* No. 1:08–cv–101–SEB–WGH., 2011 WL 902026, at *15 (S.D. Ind. Mar. 14, 2011) (providing example of report discussing subjective experience of pain and comparing it with results of various diagnostic procedures to assess effect pain had on a claimant's ability to function). The subtext of Dr. Katz's report may be that Druhot is pretending that the pain is more debilitating than it really is, but he offers no reasoning that would allow the court to credit him. (*See* AR 599–602.) Nor is he a specialist in psychology. (*See* AR 602); *see also Kennedy*, 856 F.3d at 1138 (disregarding testimony of psychologists on physiological disorder and testimony of urologist as "irrelevant" to whether fibromyalgia impaired the plaintiff's ability to work).

That leaves Dr. Wilson's reports prepared after he reviewed the file. Dr. Wilson concluded that all physical examinations showed normal findings except for her gastrointestinal issues. (AR 636.) While he offers a somewhat convincing analysis of why he believes the CVID diagnosis is at best borderline (AR 673) due to lack of physical complications normally associated with CVID, he does not assail the fibromyalgia diagnosis (AR 637); *see Hawkins*, 326 F.3d at 916 (noting "the unavailability of objective clinical tests" to determine level of pain caused by fibromyalgia). Like Dr. Shvarts, Dr. Wilson relies on the alleged dog-walking incident as supporting his conclusion that her plantar fasciitis "should not pose also [sic] an issue with her being able to work as an attorney." (AR 637.) Nothing in his report suggests that he considered

"the difference between a person's being able to engage in sporadic physical activities and her being able to work eight [or more] hours a day five [or more] consecutive days of the week." *Carradine*, 360 F.3d at 755 (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)) (other citations omitted).  And he makes the same sort of leap as Dr. Shvarts.  Dr. Wilson's report states that if, based on a review of a picture, Druhot "is able to perform walking and other activities associated with walking a dog…" she has "no limitations of activities of daily living" and "can return to work [as an attorney] immediately."  (AR 637, AR 639.)  This would come as something of a surprise to the nation's law students, that the threshold requirement for practicing law is based on the ability to walk a dog.  More importantly, Dr. Wilson's review does not engage with the functional limitations Druhot reported in the medical records that he had in front of him, such as her inability to concentrate and get more than two hours of sleep a night.  (AR 587.)

Finally, the SSA's disability determination adds weight to the conclusion that Druhot is totally disabled.  The SSA's determination of disability is not binding on employers under ERISA.  *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 398 (7th Cir. 2009) (citing *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 610 (7th Cir. 2007)).  SSA determinations are instructive but not determinative.  *Id.*  Social Security defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The plan here defines "Totally Disabled" or "Total Disability" as follows: "as a result of an Injury or Sickness, during the Elimination Period and thereafter an Insured cannot perform the

material duties of his/her Regular Occupation." (AR 10.) The SSA definition of disability is more stringent: "disability under Social Security law requires a person to be unable to perform any occupation, whereas the Plan required occupational disability only in [Plaintiff's] own occupation." *Mirocha v. Metro. Life Ins. Co.*, 56 F. Supp. 3d 925, 935 (N.D. Ill. 2014). Reliance Standard points out that the SSA did not have its doctors' reports before it. Even so, its conclusion under a more demanding standard based on Dr. Siri's opinion, the Mayo Clinic diagnosis, and Druhot's medical records gives that evidence added weight here. *See, e.g.*, *White v. Airline Pilots Ass'n, Int'l*, 364 F. Supp. 2d 747, 768 (N.D. Ill. 2005) (citing *La Barge*, No. 00 C 0512, 2001 WL 109527 at *8, (N.D. Ill. Feb. 6, 2001), which described SSA determination as "compelling evidence" of disability).

Though the court has discussed the evidence somewhat serially, it weighs it cumulatively. The court finds by a preponderance of the evidence that Druhot has proven that due to a sickness, she is unable to perform one or more of the material job duties of her primary occupation as an attorney. She is therefore entitled to disability payments.

## IV. REMEDIES

The record shows that beginning April 2, 2015, Druhot is entitled to a monthly benefit of $9,840, which fell to $7,203 per month on July 1, 2015 when Druhot was awarded Social Security disability benefits. (*See* PSF ¶¶ 7, 41.) Druhot also requests her attorney's fees and prejudgment interest.

Druhot and Reliance Standard cite cases applying the arbitrary and capricious standard of review. These cases distinguish between the remedies of remand and award of benefits with an eye toward returning the parties to the status quo. *Hackett v. Xerox Corp. Long-Term Disability*

*Income Plan*, 315 F.3d 771, 775–76 (7th Cir. 2003) (citing *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472 (7th Cir. 1998)). The parties agree, however that the *de novo* standard applies here. Where the court looks at the question of entitlement to benefits *de novo*, "the question before the district court was not whether the plan administrator gave claimant a full and fair hearing or undertook a selective review of the evidence; rather, it was the ultimate question of whether claimant was entitled to the benefits he sought under the plan." *Walsh v. Long Term Disability Coverage for All Emps. Located in the U.S. of DeVry, Inc.*, 601 F. Supp. 2d 1035, 1043 (N.D. Ill. 2009) (quoting *Diaz*, 499 F.3d at 643) (brackets omitted). As the court has resolved that ultimate question rather than found a procedural violation, returning the parties to the status quo entails reinstating Druhot's benefits. *See White*, 364 F. Supp. 2d at 767–68 (citations omitted) (conducting trial on the papers, finding claimant was entitled to benefits, and ordering reinstatement on arbitrary and capricious review); *Saliamonas v. CNA, Inc.*, 127 F. Supp. 2d 997, 1001 (N.D. Ill. 2001) (determining claimant was entitled to benefits and entering summary judgment in his favor).

The court also awards Druhot her attorney's fees and prejudgment interest. ERISA permits "the court in its discretion [to award] a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1) (West 2017). Because Druhot has prevailed, the court asks, in its discretion, whether Reliance Standard's "litigation position was substantially justified and taken in good faith or whether they were out to harass" Druhot. *See Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis., Inc.*, 657 F.3d 496, 506–507 (7th Cir. 2011) (citing *Huss v. IBM Med. & Dental Plan*, 418 F. App'x 498, 512 (7th Cir. 2011)); *see also Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010) (interpreting § 1132(g)(1) as follows:

"if the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'" (alteration and quotation omitted)); *Kolbe & Kolbe*, 657 F.3d at 506 (explaining that the five-factor test and other doctrinal tests in the Seventh Circuit "essentially ask the same question" (quoting *Quinn*, 161 F.3d at 478)). Under ERISA, "there is a modest presumption that the prevailing party . . . is entitled to a fee." *Hess*, 274 F.3d at 464 (citing *Bowerman v. Wal–Mart Stores, Inc.*, 226 F.3d 574, 592 (7th Cir. 2000)). In light of the modest presumption, the court concludes that an award of attorney's fees is warranted. *See also see Hardt*, 560 U.S. at 255–56. Reliance Standard first suggested that Druhot apply for Social Security benefits and then refused to consider the SSA's decision. That smacks of bad faith, as does Reliance Standard's reliance on several doctors who did not discuss Druhot's functional limitations as they related to what she does for a living and instead focused myopically on a report that she may have once walked her dog. Had Reliance Standard applied its criteria for disability to the reports of its own doctors, this litigation could have been avoided. *See Hess*, 274 F.3d at 464 (affirming award of fees because finding that claim administrator took a "lackadaisical approach in this case" was reasonable and litigation could have been avoided); *White*, 364 F. Supp. 2d at 767–68. For the same reasons, the court awards Druhot prejudgment interest at the prime rate. *See Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 819–20 (7th Cir. 2002) (holding that award of prejudgment interest is appropriate); *Gorenstein Enters., Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) (suggesting use of prime rate to fix prejudgment interest rate); *Tassone v. United of Omaha Life Ins. Co.*, --- F. Supp. 3d ----, No. 15

C 8557, 2017 WL 3838095, at *9 (N.D. Ill. Aug. 30, 2017) (awarding interest based on same authority).

## V. CONCLUSION

For the reasons stated, Druhot's motion for entry of judgment (ECF No. 17) is granted, and Reliance Standard's motion for entry of judgment (ECF No. 33) is denied. Druhot is directed to send a proposed judgment to the court on or before October 19, 2017.


Date: September 28, 2017                    _____/s/_____
                                            Joan B. Gottschall
                                            United States District Judge